**OEC–DIASONICS, INC., Appellant–Defendant,**

v.

**Ralph S. MAJOR, Jr., Appellee–Plaintiff.**

No. 50A03–9209–CV–282.

Court of Appeals of Indiana, Third District.

Nov. 3, 1993.

---

James H. Ham, III, Joe C. Emerson, Indianapolis, Jeffrey A. Townsend, Baker & Daniels, Fort Wayne, for appellant-defendant.

Robert W. Mysliwiec, Jones, Obenchain, Ford, Pankow & Lewis, South Bend, for appellee-plaintiff.

GARRARD, Judge.

OEC–Diasonics, Inc. (OEC–Diasonics) appeals a judgment following a bench trial in favor of Ralph S. Major, Jr. (Major) in the amount of $3,138,118.00. We reverse.

## FACTS AND PROCEDURAL HISTORY:

The record in this case reveals that on September 15, 1969, Major and Orthopedic Equipment Company, Inc. (OEC) entered into a contractual relationship. The agreement provided that Major would be the sole and exclusive distributor for OEC's products in a territory consisting of North Carolina, South Carolina, Virginia, and West Virginia. Soon after the contract was signed, OEC became dissatisfied with the agreement and the contract has been the source of controversy and litigation since that time.

Sometime in the mid 1970's OEC began to market an x-ray device known as the C–Arm through its Medical Systems Division. In 1978 Major was granted the right to sell the C–Arm under the performance criteria set forth in the 1969 agreement. Major continued to market other OEC products under the 1969 agreement as before.

In 1980 or 1981, OEC underwent a reorganization. The Medical Systems Division of OEC was established as a separate cor-

porate entity known as OEC Medical Systems, Inc. (OEC Medical Systems). OEC and OEC Medical Systems then both became wholly owned subsidiaries of OEC International, Inc. (OEC International).

On May 15, 1981, Major and Benno Lotz, then president of OEC, executed a modification to the 1969 agreement. The modification did not change the provisions of the contract relative to the length of the contract or the performance clause of the contract other than to delete a six month notice provision previously contained in paragraph 20. Attachments to the modification agreement refer to the Medical System's Product Line, products which were manufactured by the Medical Systems Division of OEC. No new contracts were executed between Major and OEC Medical Systems. The parties, however, conducted their day to day business activities as if the 1969 agreement, as modified on May 15, 1981, applied separately to both OEC and OEC Medical Systems.

In 1983, Diasonics, Inc. (Diasonics) purchased OEC International. In 1984, Biomet, Inc. acquired all the stock in OEC, still a wholly owned subsidiary of OEC International. Diasonics retained OEC Medical Systems. In 1985, OEC Medical Systems changed its name to OEC–Diasonics, Inc., the defendant in this action. These transactions left Major with obligations under the modified 1969 agreement to Biomet, on the sale of orthopedic products, and OEC–Diasonics, on C–Arm products.

After the Biomet acquisition early in 1984, OEC–Diasonics experienced a decline in C–Arm sales which continued through 1985. Major's sales also declined in 1985 by over $1,000,000.00. In January of 1986, primarily because of the decline in Major's sales, OEC–Diasonics exercised what it believed was its option to void the distributorship arrangement with Major. Major also encountered a conflict with Biomet who likewise terminated its relationship with Major in 1987. Both terminations were challenged by Major and ended in litigation. Major settled his suit against Biomet in January of 1988 and executed a release discharging Biomet, OEC (and their respective officers, directors, employees, subsidiaries, affiliates, successors and assigns) from, amongst other things, any further liability arising out of their distributor relationship. Major continued his litigation against OEC–Diasonics and obtained a judgment on May 22, 1992, in the amount of $3,138,118.00.

OEC–Diasonics appeals from this judgment and raises several issues relating to the interpretation of section 20 of the modified 1969 agreement, the calculation of damages, and the effect of the release contained in the 1988 settlement agreement between Biomet and Major. Because we find that the release was effective against both Biomet and OEC–Diasonics, we reverse without reaching the other issues raised.

DISCUSSION:

OEC–Diasonics contends that the release executed in the 1988 settlement agreement between Biomet and Major also releases them from liability in this action. We agree.

■ A release is a surrender of a claimant's right to prosecute a cause of action. *Lechner v. Reutepohler* (1989), Ind.App., 545 N.E.2d 1144, 1147. Release agreements, like contracts generally, are interpreted as a matter of law, absent some ambiguity. *Id.* Interpretation of a release, like any other contract, is determined by the language of the particular instrument, considered in the light of all the facts and circumstances. *Id.* A release executed in exchange for proper consideration works to release only those parties to the agreement unless it is clear from the document that others are to be released as well. *Huffman v. Monroe County Community School Corp.* (1992), Ind., 588 N.E.2d 1264, 1267. A release, as with any contract, should be interpreted according to the standard rules of contract law. *Id.* The intention of the parties regarding the purpose of the document governs its interpretation. *Id.*

In this case the release executed between Biomet and Major reads as follows:

9. *Release by Major.* Major hereby RELEASES AND FOREVER DISCHARGES Biomet, OEC (and their respective officers, directors, employees, subsidiaries, affiliates, successors and assigns) and Miller from any and all claims, debts, demands, losses, agreements, actions, accounts, causes of action, damages, and liabilities whatsoever, whether in law or in equity, resulting from, respecting, relating to or arising out of any fact, occurrence or omission existing prior to the date of this Agreement, which Major now has or may later discover in connection with or arising out of any and all matters arising out of or in connection with their distributor relationship or the issues raised by this Complaint. (R. 4389).

The parties to this agreement are delineated in the first paragraph of the settlement agreement as follows:

THIS AGREEMENT, made and entered into this 29th day of January, 1988, by and among Biomet, Inc. ("Biomet"), having its principal place of business at Airport Industrial Park, P.O. Box 587, Warsaw, Indiana 46580, Dane A. Miller ("Miller"), whose address is Airport Industrial Park, P.O. Box 587, Warsaw, Indiana 46580, and Ralph S. Major, Jr. individually and d/b/a Major and Associates, Inc. ("Major"), whose address is P.O. Box 29835, Richmond, Virginia 23229. (R. 4385).

Two paragraphs later the parties to this agreement describe and define "OEC":

WHEREAS, a dispute has arisen between Biomet and Major arising out of their relationship and the notice of termination by Biomet of an Agreement originally entered into between Major and *Orthopedic Equipment Company, Inc. ("OEC"), on September 15, 1969* ... (R. 4385) (emphasis added).

Thereafter in the settlement agreement whenever these persons or entities are referred to, their shortened, delineated names are used. No other provision in the agreement purports to modify or redefine the term "OEC."

In addition to the provisions mentioned above, the settlement agreement also contains an integration clause. This clause reads as follows: ·

19. *Entire Agreement.* This Agreement contains the entire agreement of the parties hereto with respect to the subject matter hereof and shall be deemed to supersede all prior agreements, whether written or oral, and the terms and provisions of any such prior agreement shall be deemed to have been merged into this Agreement. (R. 4391).

We first examine the effect of this integration clause on the agreement in order to determine whether parol evidence was admissible to vary or add to the writing.

 In general, the parol evidence rule is not a procedural rule that excludes evidence. It is a rule of preference and is one of substantive law which prohibits both the trial court and appellate court from considering such evidence even though it was admitted at trial without objection.[1]

---

1. Although distributor relationships are generally more than mere contracts for the sale of goods, courts have not hesitated to apply the Uniform Commercial Code to cases involving them. IC 26–1–2–102; *Moridge Mfg. Co. v. Butler* (1983), Ind.App., 451 N.E.2d 677, 680. We therefore acknowledge the applicability of IC 26–1–2–202 on final written expressions and parol or extrinsic evidence. IC 26–1–2–202 reads as follows:

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:

(a) by course of dealing or usage of trade (IC 26–1–1–205) or by course of performance (IC 26–1–2–208); and

(b) by evidence of consistent additional terms, unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

This statement of the parol evidence rule is similar to Indiana's common law understanding of the traditional parol evidence rule. Therefore, for the purposes of this case we adopt the common law understanding pertaining to the effect of integration clauses.

*Franklin v. White* (1986), Ind., 493 N.E.2d 161, 165–66. Therefore, an integration clause of a contract is to be considered as any other contract provision to determine the intention of the parties and to determine if that which they intended to contract to is fully expressed in the four corners of the writing. *Id.* at 166. Evidence, parol or otherwise, extrinsic to the written provisions of a contract will not be admitted for the purpose of varying or adding to that writing when it appears that both parties intended a complete integration of that contract in the written terms. *Id.* As has been stated previously by this court:

> A writing intended to be the final and complete agreement between two parties, is an integration, and no prior or contemporaneous oral agreements may be introduced into evidence to add to, subtract from or change the written instrument in any manner.

*Clark Mutual Life Insurance Co. v. Lewis* (1966), 139 Ind.App. 230, 217 N.E.2d 853, 856.

■ The determination of whether the parties intended a writing to be totally integrated must be based on all the relevant evidence. *Franklin, supra* at 166. A merger (integration) clause does not control the question of whether a writing was intended to be a completely integrated agreement. *Id.* An integration clause is only some evidence of the parties' intentions. We consider an integration clause along with all other relevant evidence on the question of integration. *Id.*

■ The weight to be given to an integration clause will vary, depending on the facts and circumstances of each particular case. *Id.* Where the parties are not in a position of power to bargain equally, the integration clause may not accurately express a meeting of the minds. *Id.* However, where two sophisticated parties engage in extensive preliminary negotiations,

an integration clause may, in fact, reflect their mutual intention to abandon preliminary negotiations in favor of a complete and final statement of the terms of their agreement. *Id.* As stated in 38 Am.Jur.2d *Guaranty* § 124 (1968):

> The exclusionary aspects of the parol evidence rule have been justified on the basis of reliance by the parties on the written document, and that to remove this reliance would destroy the confidence on which modern business has been built.

■ In the present case, both parties to this settlement agreement are sophisticated business entities with an extensive history and course of doing business together. At the time of this settlement, the parties were well versed in the subject matter of the litigation and the risks and benefits of entering into an agreement of this sort. To decide that an integration clause in a document executed by parties such as these was not effective to demonstrate the intentions of the parties, would be to effectively nullify the usefulness of this device and deprive all contracting parties of the opportunity to employ this drafting technique. *See Franklin, supra* at 167. We can think of no clearer case of sophisticated arm's-length bargaining and therefore find that the agreement in this case is completely integrated, constituting a final and complete expression of all the parties' agreements. Evidence of prior or contemporaneous written or oral statements and negotiations cannot operate to either add to or contradict the clear and unambiguous language of the written agreement. *Id.*[2]

We next proceed to examine the face of the document to determine the extent of the release and who can take advantage of its protections. The most important question revolves around the interpretation of

---

2. We note that while parol evidence may not be introduced to add to or contradict the written agreement, evidence outside the document may be introduced to clarify or interpret an ambiguous term or phrase. *See Huffman, supra* at 1267. If a document is clear and unambiguous on its face, no parol evidence may be utilized to determine the parties' true intentions respecting the document's application. *Id.* If there is an ambiguity or if contradictory references in the document cloud the intent of the parties, parol evidence is allowed in for the purposes of clarifying any ambiguity. *Id.*

paragraph 9 of the settlement agreement. Paragraph 9 states that "Major hereby RELEASES AND FOREVER DISCHARGES Biomet, *OEC* (and their respective officers, directors, employees, subsidiaries, affiliates, *successors and assigns*) and Miller from any and all claims ..." (R. 4389) (emphasis added). OEC is defined early in the agreement as "Orthopedic Equipment Company, Inc. ("OEC"), [that contracted with Major] on September 15, 1969." This referencing is consistent with the way other organizations and persons are defined and referenced in the agreement. For example, when referencing Biomet, the parties stated "Biomet, Inc. ("Biomet")", or when referencing Major, "Ralph S. Major, Jr. individually and d/b/a Major and Associates, Inc. ("Major")". It is therefore clear from the face of the agreement that the OEC referenced in paragraph 9 is the Orthopedic Equipment Company, Inc. *in existence* on September 15, 1969.

 The question next becomes whether OEC–Diasonics, the defendant in this case, is a successor or assign of OEC and thereby covered in this release.[3] In 1969, Orthopedic Equipment Company, Inc. (OEC) contracted with Major to be the sole and exclusive distributor for OEC's products in North Carolina, South Carolina, Virginia, and West Virginia. In the 1970's OEC began to market a product called the C–Arm through its Medical Systems Division. Major was granted the right to sell this product under the performance criteria set forth in the 1969 agreement. When the Medical Systems Division was separately incorporated as OEC Medical Systems, Inc., it remained obligated to Major under the 1969 agreement. The subsequent modification of this agreement did not change or affect the performance criteria or obligations owed by each party. OEC Medical Systems is therefore an assignee of OEC with regard to its obligations under the 1969 agreement. OEC Medical Systems later changed it's name to OEC–Diasonics, the defendant in this case, but remained obligated to Major under the 1969 agreement. OEC–Diasonics is therefore also an assignee of OEC with respect to the 1969 agreement and hence is covered under the release executed between Biomet and Major.

Major contends, however, that he did not intend to release OEC–Diasonics when he executed the settlement agreement with Biomet. As was noted previously, we determine the intent of the parties from the four corners of the agreement. *Estate of Carnahan v. ISM, Inc.* (1987), Ind.App., 510 N.E.2d 748, 750, *trans. denied.* Where the language is unambiguous we will give such language conclusive effect as to the intent of the parties. *Id.* A release executed in exchange for proper consideration works to release only those parties to the agreement unless it is clear from the document that others are to be released as well. *Huffman, supra* at 1267. In this case the language employed unequivocally indicates that the parties intended to release not only the parties to the agreement, but also OEC, the entity in existence on September 15, 1969, and its successors and assigns. To the extent that this was not Major's intent at the time of the agreement, he should have so stated in the writing. At the time of execution he was fully aware of his claims against OEC–Diasonics and was already engaged in litigation. He cannot now be heard to claim that he did not mean what he said.

 Major also contends that this agreement does not release OEC–Diasonics because OEC–Diasonics gave no consideration for the agreement and was not a party thereto. Major is mistaken. We have long recognized the validity of third-

---

**3.** We note that the settlement agreement executed between Biomet and Major also contains a paragraph which reads as follows:

> 14. *Successors and Assigns.* This Agreement shall inure to the benefit of, and may be enforced by, and shall be binding on the parties hereto and their respective assigns and successors in interest. (R. 4390).

This paragraph merely overlaps with the language of paragraph 9 and cannot in any way be considered contradictory with it. This paragraph, therefore, cannot be the source of any ambiguity with regard to who is covered under the release in paragraph 9.

party beneficiary contracts. *Estate of Carnahan, supra* at 749. Those who are not a party to a contract may enforce the contract by demonstrating that they are third-party beneficiaries. *Id.* In general, a third-party beneficiary contract requires a clear intent to benefit a third party, must impose a duty on one of the contracting parties in favor of the third party, and must render to the third party a direct benefit. *Id.* at 750. Third-party beneficiaries may enforce the contract even though they had no knowledge of the agreement at the time it was made. *Id.* The intent of the parties to benefit the third party is the controlling factor. This may be shown by specifically naming the third party. *Id.*

■ The agreement in the present case specifically names OEC in its release, as well as OEC's assigns. The release clearly confers a benefit on OEC and its assigns, as well as a duty on Major obligating him to forego suit. While OEC–Diasonics is not a signatory to the settlement agreement, its status as a third party beneficiary, found in the express language of the agreement, confers upon it the right to enforce its provisions against Major in this case.

■ In addition, it is equally unavailing for Major to argue that no consideration was given by OEC–Diasonics. Major apparently looks to the release standing alone and claims that no consideration was tendered by OEC–Diasonics for this release. It is true that, as in any other contract, a release must be supported by sufficient consideration. *Lechner, supra* at 1148. The release provision was, however, part of a larger agreement to settle a lawsuit against Biomet. Biomet agreed to pay Major a substantial yearly sum in addition to options to purchase Biomet stock and other consideration for the full agreement. Because consideration for the agreement as a whole was adequate, we deem consideration for the individual provisions, including the release, to be adequate as well. *Id.*

CONCLUSION:

The trial court erred in failing to recognize the validity of the release agreement and failed to enter summary judgment for OEC–Diasonics on this basis. For the foregoing reasons the judgment of the trial court is reversed and the case is remanded with instructions to enter judgment for the defendant.

Reversed and remanded.

HOFFMAN, and SHIELDS, JJ., concur.