**Ray CALLANDER, Appellant (Defendant Below),**

v.

**Thomas SHERIDAN and Toni Sheridan, Appellees (Plaintiffs Below).**

**No. 71A03–8811–CV–359.**

Court of Appeals of Indiana, Third District.

Nov. 29, 1989.
Rehearing Denied Jan. 31, 1990.

---

James M. Miller, South Bend, for appellant.

Terrance F. Wozniak, Chapleau, Farabaugh & Wozniak, South Bend, for appellees.

STATON, Judge.

Ray Callander appeals the judgment of the trial court in favor of Thomas and Toni Sheridan. The trial court awarded the Sheridans $11,000.00 in damages for Callander's breach of an implied warranty of habitability.

Callander presents us with four issues on appeal:

1. Whether one who is not in the business of building and selling homes for profit can be considered a builder-vendor for the purpose of attaching liability for an implied warranty of habitability?

2. Whether latent defects in the dwelling constituted a breach of the implied warranty of habitability?

3. Whether the implied warranty of habitability was waived by the purchase agreement?

4. Whether the Sheridans failed to mitigate their damages?

Affirmed.

Callander engaged several subcontractors to build a house beginning in July 1976. He and his family occupied the house later that same year. The Sheridans entered into a purchase agreement with Callander to buy the home in August 1979. They moved into the house in February of 1980. That summer Mr. Sheridan began to notice cracks in the concrete porch and sidewalk. Over the next two years the cracks became larger and four brick pillars supporting a roof overhang began to bow. The Sheridans commenced an action for damages in the St. Joseph Circuit Court in August 1983. In their complaint the Sheridans alleged defects in the foundation and construction of the home which impaired their habitation and enjoyment of the home. They asked for damages of $10,-000.00 for breach of the implied warranty of habitability. The case was tried without a jury in April 1988. The trial court entered findings of fact and conclusions of law.

When the trial court has entered special findings, we apply a two-tier standard of

review. First, we must determine whether the evidence supports the findings, and then we must determine whether the findings support the judgment. Special findings will be set aside only if they are clearly erroneous, that is, if the record contains no facts or inferences supporting them. *Northwest Calf Farms, Inc. v. Poirier* (1986), Ind.App., 499 N.E.2d 1165, 1166–67, *reh. denied, trans. denied.*

## I.

### Builder-vendor

The most important issue we must decide is whether one who is not in the business of building and selling homes for profit can be considered a builder-vendor for the purpose of attaching liability for an implied warranty of habitability?

This warranty was first applied to builder-vendors by the Indiana Supreme Court in *Theis v. Heuer* (1972), 264 Ind. 1, 280 N.E.2d 300, 306. In *Theis* our supreme court held that there is "an implied warranty of fitness for inhabitation in the sale of a new house by the builder-vendor to the immediate purchaser." *Id.* The warranty was extended to subsequent purchasers by *Barnes v. Mac Brown and Company, Inc.* (1976), 264 Ind. 227, 342 N.E.2d 619, 620.

Callander contends he is exempt from the implied warranty of habitability because he was not a builder-vendor at the time of sale. He states in his brief that he "was not in the business of building homes for resale to the general public, nor possessed of training in the building trades, nor the beneficiary of experience from a previous self-built residence." Appellant's brief 19.

The evidence shows that in July of 1976 Callander began construction of a house. A builder gave him the plans for the house and Callander modified them by extending the roof to create a covered walkway. He obtained a building permit for the house in his own name and he hired subcontractors to do the work on the house. Callander directly purchased the electrical equipment and lumber for the house. He told a subcontractor where to put the basement and how deep it should be and he instructed a subcontractor on where and when to do backfilling. During the construction of the house Callander had a motor home on the premises and he was there in the evenings to observe the work being done. Callander did most of the electrical wiring, stained the moldings, laid ceramic floor and did the landscaping. His testimony indicates that he was well aware of the responsibilities of the individual subcontractors and that he was familiar with many building terms of art. Callander's own brief admits that he acted as "his own general contractor." Appellant's brief 14.

A general contractor is defined as one who:

[c]ontracts to perform specified construction work in accordance with architect's plans, blueprints, codes, and other specifications: Estimates costs of materials, labor, and use of equipment required to fulfill provisions of contract and prepares bids. Confers with clients to negotiate terms of contract. Subcontracts specialized craft work, such as electrical, structural steel, concrete, and plumbing. Purchases material for construction. Supervises workers directly or through subordinate supervisors.

U. S. Department of Labor, *Dictionary of Occupational Titles*, 182.167–010, 1977, Fourth Edition. Although Callander did not perform all of these activities, he did many of them and it appears from the evidence that no one else involved in construction of the house fit this description. Callander obtained and modified the house plans, hired and supervised subcontractors, and purchased material for construction. His role was active; without his participation the house building project would not have been concerted.

Apparently Callander felt he was qualified to act as a general contractor. Since he undertook this responsibility he must also accept the attached liability of a builder-vendor to a subsequent buyer.

## II.

### Latent Defects

Callander contends that there was no breach of the implied warranty of habit-

ability because the Sheridans were still able to live in the house. In *Wagner Construction Co., Inc. v. Noonan* (1980), Ind. App., 403 N.E.2d 1144, 1148–49, this court said:

> The implied warranty of fitness for habitation does not require that the dwelling be rendered totally uninhabitable before there is a breach of the warranty. Rather, breach of the warranty is established by proof of a defect of a nature which substantially impairs the enjoyment of the residence.
>
> \*  \*  \*  \*  \*  \*
>
> It is sufficient to support such a claim if, because of the defect, the owner's use and enjoyment of his dwelling as a place of human habitation was substantially impaired.

Callander modified the building plans to extend the roof to create a covered porch and walkway. He supported the roof by adding four brick pillars. Shortly after the Sheridans moved into the house, concrete on the porch and sidewalk began cracking, becoming progressively worse. The pillars began to bow. An expert testified that "if you grab them [the pillars] with your hands, you could literally push them over." R. 282. This testimony supports the trial court's finding that "[t]his defect now results in the pillars being in imminent danger of collapsing and interferes with Plaintiffs habitability of the residence in question." R. 172.

We agree with the trial court that the defects in the porch and pillars constitute a breach of the implied warranty of habitability.

### III.

#### Purchase Agreement

■ Callander contends that a clause in the purchase agreement releases him from any liability he might otherwise have incurred.

The disputed clause is part of a standard purchase agreement. Under the section entitled "Inspection" a box has been checked with a typed in "x." That section states:

> Inspection of the real estate and improvements thereon is hereby waived by Purchaser who is relying entirely for its condition upon Purchaser's own examination and Purchaser hereby releases the Seller, Realtor/Broker and their sales agents from any and all liability relating to any defect or deficiency affecting the real estate and improvements which release shall survive the closing of the transaction.

R. 403.

This section deals with "inspection." An implied warranty of habitability to a subsequent purchaser deals with latent defects "not discoverable by a subsequent purchaser's reasonable *inspection* ...". *Barnes* at 342 N.E.2d at 621 (our emphasis).

In the case at bar the defects in the porch and pillars were not visible at the time of sale. An expert witness testified that the reason for the cracking of the concrete and the bowing of the pillars was that there was no footing below the frostline. He had to excavate to make that determination. The witness explained that it is important to place footing below masonry and supporting structures to prevent frost from causing the soil to heave, resulting eventually in the cracking or crumbling of the masonry or supporting structure. He testified that Sheridans' house was built on clay soil which holds moisture and exacerbates the problem.

The Sheridans could not have discovered the absence of the footing without digging beneath the porch and pillars to the frostline, which according to testimony is approximately thirty six inches below the surface. Therefore, the disputed clause does not operate as a release from liability for the latent defects in the porch and pillars because these defects could not have been discovered through a reasonable inspection. We further note that Callander is not just a "seller" as covered by the release but a builder-vendor and there is nothing in this clause releasing a builder-vendor from liability.

### IV.

#### Mitigation

Finally, Callander contends Sheridans were under a duty to mitigate their damages.

It is true that a non-breaching party must mitigate damages. However the breaching party has the burden of proving the non-breaching party has not used reasonable diligence to mitigate damages. *Indiana Industries, Inc. v. Wedge Products* (1982), Ind.App., 430 N.E.2d 419, 428, *reh. denied., trans. denied.* Callander lists other repairs the Sheridans made in the sum of $5,907.96. He claims that this amount should have been used to mitigate damages to the porch and pillars and that the judgment against him should be offset by this amount. Although Callander refers to the repairs Sheridans made as "cosmetic items," the record does not support this interpretation. One of these "cosmetic items" was the repair of a retaining wall that Sheridan testified "was leaning at a 90–degree angle at the top pulling away the bricks on the fireplace ...". R. 254.

The Sheridans claim they had limited resources and could only afford to make a few repairs at a time. They contend that since the repairs to the porch and pillars were the most expensive, they had to postpone their repair for financial reasons. If a party is financially unable there is no duty to mitigate through the expenditure of funds. *Persinger v. Lucas* (1987), Ind. App., 512 N.E.2d 865, 870. The fact that the Sheridans made other repairs that they considered more urgent or affordable does not show that they were financially able to repair the porch and pillars and does not entitle Callander to a set-off.

Affirmed.

RATLIFF, C.J., dissents with separate opinion.

HOFFMAN, J., concurs in result.

RATLIFF, Chief Judge, dissenting.

Insofar as the majority opinion fails to bar the Sheridans from recovery based upon the release provision of the purchase agreement, I must dissent.

The language of the provision is unambiguous and releases Callander from all liability arising out of defects in the premises. At the time the purchase agreement was entered into no public policy prevented the parties in the present case from agreeing to release Callander from liability arising out of even latent defects. *See Lechner v. Reutepohler* (1989), Ind.App., 545 N.E.2d 1144, 1148 (an identical release provision held to be unambiguous and to bar the homeowners' recovery against the builder-vendor for defects in the foundation of the home.)